In the Matter of the Claim of E. I. duPont deNemours Powder Company, Respondent, Appellant, against the City of New York, Appellant, Respondent, under Section 42, Chapter 724 of the Laws of 1905, as Amended by Section 9, Chapter 314 of the Laws of 1906. (Business Damage Commission No. 3.)

Third Department, November 12, 1919.

Eminent domain — city of New York — injury to water power by erection of Ashokan dam — excessive award — evidence — opinion as to values not based upon existing facts.

Appeal from an award made against the city of New York for damages arising from injury to a water power owned by the claimant on the Esopus creek, caused by the construction of the Ashokan reservoir. Evidence examined, and *held*, that the value of the property had been grossly exaggerated by the claimant's witnesses and that the commissioners of appraisal had estimated the damage done at an excessive figure, so that the order confirming the award should be reversed.

Damages cannot be based upon expert testimony as to the value of water rights which assumes that if the claimant's dam were raised the water power would be increased, if the raising of the dam would result in impounding water upon lands to which the millowner has no title.

Appeal by the City of New York from an order of the Supreme Court, made at the Ulster Special Term and entered in the office of the clerk of said county on the 19th day of February, 1918, confirming the majority report and award to the E. I. duPont deNemours Powder Company, made by Business Damage Commission No. 3.

Appeal by the claimant, E. I. duPont deNemours Powder Company, from so much of said order as denies the claimant's motion for an allowance for counsel fees and for expenses of witnesses and interest upon the award.

*Van Etten & Cook* [*John G. Van Etten* of counsel], for the claimant.

*William P. Burr*, Corporation Counsel [*William McM. Speer* of counsel], for the City of New York.

H. T. Kellogg, J.:

An award has been made against the city of New York for damages done to the claimant as the owner of a water power on the Esopus creek below the Ashokan reservoir, by the closing of its gates in September, 1913. The claimant owned land on both sides of the stream together with a pulp mill and several buildings. Power was supplied to the mill by means of a masonry dam, built ten feet high on a ledge of rocks having a natural fall of eighteen feet, thus affording a head of twenty-eight feet. The mill was equipped with thirteen water wheels capable of developing 1,600 horse power when the river flow was exceptional. It was operated exclusively to manufacture dry wood pulp, commonly called wood flour, which is used extensively in dynamite factories as an absorbent for nitro-glycerine, and is also used in the manufacture of linoleum and wall paper. For more than fifteen years the mill supplied wood flour to the claimant, or the duPont partnership which preceded it, for use in the manufacture of dynamite, while it sold the excess product to the linoleum and paper trade. It produced from 3,000 to 4,000 tons annually, or about one-fourth or one-fifth of all the wood flour used in the country. This indicated the development at the water wheels of a total horse power which if distributed equally throughout the year would mean 500 horse power daily. The natural drainage area of the Esopus creek contributing to the flow at the dam of the claimant was 264 square miles. When the waters of the creek above the Ashokan reservoir were impounded therein by the closing of its gates, the drainage area of the stream at the dam was reduced to 7 square miles, the flow became insufficient to turn the mill

wheels, and all business upon the premises ceased. The claimant, having filed a claim for damages, was awarded $90,000 for decrease in value of its real estate, and $24,000 for injury to its established business. From this award the city of New York appeals.

The property in question was purchased in 1895 by Hamilton Barksdale from Edwin Burhans, was conveyed in 1896 by Barksdale to the Hudson River Wood Pulp Manufacturing Company, was sold by that company in 1905 to the Eastern Dynamite Company, and in 1909 was acquired by the claimant, the E. I. duPont deNemours Powder Company. This last-named company, or the duPont partnership which preceded it, owned all the stock of the other companies, so that ever since 1896 the claimant, to all intents and purposes, has been the owner of the property. Throughout this period the business at the mill has made a showing of substantial prosperity. Figures have been given indicating that the sales values of its products, during the thirteen years prior to its closing, were $975,904.92, while the total cost of manufacture was $714,685.06, leaving a net profit of $261,219.86, or an average annual profit of more than $20,000. These figures, however, are in some respects delusive, and might well lead to false deductions. The products of the mill were for a large part sold to the claimant for use by it at other mills, so that the claimant was to that extent both buyer and seller, and the prices fixed upon the sales were meaningless. The sales values given were in fact obtained by assuming that the prices paid by the linoleum and paper trade for a portion of the product constituted the criterion by which the value of the entire product should be judged. This assumption left out of consideration the fact that the claimant largely controlled the wood flour production of the country, and could have acted as to prices quite independently as long as it stayed within the figures made necessary to be charged for imported products by a liberal protective tariff. It took for granted that that portion of a total product which is consumed by its producer is for the purposes of such consumption worth the sum which he might exact from a stranger for the remaining output. According to this calculation the total per ton cost for the thirteen years prior to the closing of the mill was fourteen dollars and fifty-

six cents, while the average selling price was nineteen dollars and forty-seven cents. From 1907 to 1913 inclusive the average cost per ton was more than sixteen dollars. Prior to the year 1913 there was an import duty on wood flour of thirty-five per cent, which averaged about three dollars and fifty cents per ton. This duty was entirely removed in that year, and thereafter prices of wood flour ranged from thirteen to fifteen dollars a ton. Assuming that market conditions remained the same it would appear that after the year 1913 the mill of claimant could not have operated at a profit. Moreover, it would be fallacious to attribute to the water power of claimant any large share of the success which the manufacture of wood flour at the mill may have shown during a long period of years. The power developed was but one of many elements entering into the business of successful manufacture. The superior business sagacity of claimant, its controlling position in the trade, its efficient management, its ability to buy cheap and sell high, all these qualities, which made for success, in no wise contributed to or in the least affected the value of its water power, water rights and other real estate. The proof showed merely that the power had been used to advantage, not that the power had exceptional value.

All of the property in question was sold to Barksdale by Burhans in 1895 for the sum of $10,000. There was then a wooden dam upon the premises providing a twenty-four-foot head. The present stone dam, which gives a head of twenty-eight feet, was constructed in the year 1896 by the Hudson River Wood Pulp Manufacturing Company. Burhans swore that the cost of the new construction was about $50,000, but Henry Otis testified that he built the new dam, bulkhead, wheelpit, etc., under a contract, for the sum of $12,000, and that he made a profit on the job. After Otis testified neither Burhans nor any other person was called to dispute his figures. A new pulp mill was built upon the premises in the same year, but this was long ago described by one of the officials of the claimant as " a mere shell." The property now in question was substantially the identical property sold to Barksdale for $10,000, except for the new dam which cost $12,000, and the new pulp mill. All the buildings upon the premises, including the pulp mill, were valued for purposes

of insurance by one of the officers of the claimant many years ago at the sum of $6,000. The Hudson River Wood Pulp Manufacturing Company sold to the Eastern Dynamite Company in 1905 for the expressed consideration of $56,603. After the Ashokan dam project was well under way the Eastern Dynamite Company made an apparent sale to the claimant for $400,000. This sale was in effect from the claimant to the claimant, so that the consideration named was immaterial. However, the suspicion is not unfounded that the purpose of expressing this large sum had some relation to those proceedings which were then in prospect.

The Esopus creek is a mountain stream of an exceedingly " flashy " character. Although at times the natural flow in the river is such that if the mill of claimant were equipped for full development 7,000 horse power could be energized at the dam, there were times when less than 50 horse power could be produced. It was stated by the witness Horton that for twenty-four days in the year the average flow of the stream would be as low as fifty cubic feet, and for forty-five days as low as seventy-five cubic feet per second. Although the mill of claimant was equipped ·with ten mill stones, a letter from an official of the claimant, written many years ago, disclosed the fact that during the last three months of the years 1902, 1903 and 1904 the average number of stones running was three and seventy-one one-hundredths. In the last six months of a certain year only 1,600 tons of wood flour were manufactured, while 3,600 tons were produced in the first six months. The average cost of production was about $13, but it frequently rose to $35 per ton. As written by the manager of the Hudson River Wood Pulp Manufacturing Company in 1901, " The Esopus is a very bad customer; it is either too dry or too wet, and when wet it is liable to be very wet." Again, the same man wrote concerning the subject of a shut down of the mill on account of anchor ice, " It only shows how undesirable a mill is where water is the motive power, located in our northern climate." And, again, " Every little helps in our business, and we certainly need all we can possibly get to make our present unfortunate mill at all profitable." In view of the extreme variability of the flow of the Esopus, and

the inconstancy of the power which could be developed
at the mill of claimant the statement of Professor Landreth
that the property was worth $180,000 if the dam were raised
to give a forty-foot head, and $140,000 as presently erected,
as well as the statement of the witness Horton that the
property was worth $232,636, of which sum the value of the
riparian rights constituted $158,000, and the statement of
Edwin Burhans that the property was worth $300,000, were
not convincing.   Landreth stated the value of the horse
power produced at the mill to be from $100 to $175 per horse
power, depending upon the length of time during which any
unit of power could be continuously generated.   Yet Landreth
admitted that in the city of Cohoes, which is a great manu-
facturing center, power is sold at the price of $25 per horse
power per annum.   Horton was more generous than Landreth
in his figures, but Horton had testified in another proceeding
concerning a power upstream from the power of the claimant,
that the power there was worth $25 per horse power per
annum less many deductions, bringing its value down to
about $5 per horse power per annum.   He also testified that
a power development upon the same stream where there was
a head of twenty-eight feet, precisely the head at claimant's
mill, had a rental value of less than $1,400 per annum.   Bur-
hans, who testified that the property was worth $300,000, was
the very man who in 1895 sold all the property in question
to Hamilton Barksdale for the sum of $10,000.   Moreover,
claimant itself had for six years prior to 1913 rented the
power spoken of by Horton, which is known as Bishops falls,
and is about one mile upstream from the property of claimant,
for an annual rental of $225.   Notwithstanding the immense
valuations now put upon its property, the claimant never
used the power at Bishops falls, which was nevertheless capable
of developing as much power as was ever developed at the
dam of claimant.   The whole weight of the proof leads
naturally to the conclusion not only that the witnesses for
the claimant have grossly exaggerated the value of this
property, but that the commissioners of appraisal themselves
estimated the damage done to the real estate of the claimant
at an excessive figure.

It would also appear that no damage was done through the

closing of the gates of the Ashokan reservoir to the established business of the claimant. As early as the year 1903 the claimant began an investigation to locate a water power for the production of wood flour upon some other stream than the Esopus in order that it might diminish its cost of production. It seized upon a power at Newhall, Me., and there set up a mill which, operated with eight mill stones as against ten in the mill in question, had a total capacity of 9,000 tons per annum while the maximum at this mill was 4,000. The horse power capable of development at Newhall was not as great as at the Esopus mill, but the flow was steadier, due, among other things, to a natural storage reservoir. As the result of the closing down of the Esopus mill the production at the Newhall mill rose from 4,272 in 1911 to 7,983 in 1913. Thus claimant by using Newhall to its maximum production more than made good the loss of production at the Esopus mill for it not only continued to produce as much as formerly but it did so at a reduced cost. It would, therefore, seem that the claimant had been benefited rather than injured in its business by the closing down of the Esopus mill.

There is a further reason why this award cannot stand. The opinions of Landreth, Horton and Burhans concerning the value of this property were based on the assumption that the claimant was possessed of flowage rights entitling it to maintain a dam which would give a forty-foot head. The existence of a right to maintain a forty-foot head would greatly increase the value of the property because it would make possible a storage pond for this variable stream. At present there is no storage for the elevation of the bed of the stream fifty feet above the dam of claimant is only one foot greater than the crest of the present dam. All of the property in question came by mesne conveyances to the claimant from Robert Livingston who obtained title from Van Gaasbeck Winchell and Lemuel Winchell, Jr., in the year 1834, through a deed in which they both joined, through Lemuel Winchell, Jr., in an individual deed made by him in the same year, and another deed made by him in the year 1835. At the time of the making of the joint deed Van Gaasbeck Winchell owned the left or northerly bank of the

stream, together with the bed of the river to high-water mark on the right or south bank of the stream. Lemuel Winchell, Jr., owned all the land on the right or southerly bank of the stream above high-water mark. Lemuel had received title to this land from Van Gaasbeck by a deed which, after giving certain boundaries, described the land conveyed as it approached the stream as follows: " Then northerly along the same to the Esopus Creek at high water mark, then up along said creek or kill as it winds and turns to the place of beginning." The place of beginning was on the right or south bank of the Esopus creek. It would seem clear, therefore, that Lemuel, Jr., did not acquire from Van Gaasbeck any title to the bed of the river. While the joint deed conveyed a solid block of land on both sides of the river at the site of the dam, including the bed of the river, the land conveyed farther up the stream was merely the land on the left or northerly bank, and the land under water to the center of the stream. There was thus a strip of land under water on the right or southerly side of the stream along the lands of Lemuel Winchell, Jr., which was unconveyed, and over which no flowage rights were ever granted by Van Gaasbeck Winchell, and no flowage rights could ever have been granted by Lemuel Winchell, Jr. The water upon this strip throughout its entire length would be materially raised by the erection of a forty-foot dam, and is raised through a portion of its length by the present twenty-eight-foot dam, while the entire southerly shore of the stream between high-water mark and low-water mark would be covered with water if a dam forty feet high were erected. Now, it may be said that this question of title to land under water is unimportant, and may be disregarded. Nevertheless it concerns property which does not belong to the claimant, the flooding of which might deprive others of valuable rights. Thus the owner of an upstream power might desire to make excavation of the under water land for the purpose of installing a deep tail race for an upper mill. If the claimant had the right to lift all the water flowing over this land to a high level the property rights of such an owner to obtain a substantial head for a power might seriously be impaired. The twenty-eight-foot dam, having been installed in 1896, had not been enjoyed for twenty

years at the time the injury complained of was done. There-fore, no title had been a'cquired by adverse possession to flood the unconveyed lands to a level higher than the level of the twenty-four-foot wooden dam which had long been maintained. For these reasons the commissioners of appraisal had no right to take into consideration the opinions of Landreth, Horton and Burhans, based on the assumptions of a right to a dam making a forty-foot head. We have no knowledge that the commissioners did not base the award upon such testimony.

The award should be reversed.

All concurred.

Order of confirmation reversed, with costs, award vacated, and matter remitted to the Special Term to appoint commissioners.